WALTER J. HEIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57695. Filed June 28, 1957.

*Stuart E. White, Esq.*, for the petitioner.
*Towner Leeper, Esq.*, for the respondent.

OPINION..

PIERCE, *Judge:* The respondent determined a deficiency in the income tax of the petitioner for the calendar year 1952, in the amount of $560.47. Petitioner contends that the tax has been overpaid.

The sole issue for decision is whether, for the taxable year 1952, the petitioner qualified as "head of a household," within the meaning of section 12 (c) [1] of the Internal Revenue Code (1939). The only other issue raised in the pleadings was abandoned by petitioner, at the trial.

The case was submitted on a written stipulation of facts, together with certain exhibits that were attached and made a part thereof; and no testimony or other evidence was presented. The stipulation and attached exhibits are incorporated herein by reference; and the facts stipulated are so found. These facts may be summarized as follows:

---

[1] SEC. 12. SURTAX ON INDIVIDUALS.
 (c) RATES OF SURTAX—HEAD OF HOUSEHOLD.—
 (1) TAXABLE YEARS BEGINNING AFTER OCTOBER 31, 1951, AND BEFORE JANUARY 1, 1954.—In the case of taxable years beginning after October 31, 1951, and before January 1, 1954, there shall be levied, collected, and paid for each taxable year upon the surtax net income of every individual who is the head of a household the surtax shown in the following table: '
 * * * * . * * *
 (3) DEFINITION OF HEAD OF HOUSEHOLD.—For the purposes of this chapter, an individual shall be considered a head of a household if, and only if, such individual is not married at the close of his taxable year and maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of:
 (A) A son, stepson, daughter, or stepdaughter of the taxpayer, or a descendant of a son or daughter of the taxpayer, but if such son, stepson, daughter, stepdaughter, or descendant is married at the close of the taxpayer's taxable year, only if the taxpayer is entitled to an exemption for the taxable year for such person under section 25 (b) ; or
 (B) Any other person who is a dependent of the taxpayer, if the taxpayer is entitled to an exemption for the taxable year for such person under section 25 (b).
An individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual.
 Section 25 (b), mentioned in the above statute, provides so far as material, as follows :
SEC. 25. CREDITS OF INDIVIDUAL AGAINST NET INCOME.
 (b) CREDITS FOR BOTH NORMAL TAX AND SURTAX.—
 (1) CREDITS.—There shall be allowed for the purposes of both the normal tax and the surtax, the following credits against net income :
 * * * * * * *
 (D) An exemption of $600 for each dependent whose gross income for the calendar year in which the taxable year of the taxpayer begins is less than $600, * * *
 * * * * * * *
 (3) DEFINITION OF DEPENDENT.—As used in this chapter the term "dependent" means any of the following persons over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer :
 * * * * * * *
 (C) * * * sister * * * of the taxpayer,

The petitioner, Walter J. Hein, is a resident of St. Louis, Missouri. His income tax return for the year involved was filed with the director of internal revenue for the district of St. Louis, Missouri.

The petitioner, at all times here material, was a bachelor. Throughout the year 1952 and also for a period of approximately 30 years prior thereto, he maintained a household in St. Louis, in which he lived with three of his sisters, Clara Hein, Paula Hein, and Florence Russell; and this household was also, until at least 1946, the home of a fourth sister, Emilie Hein (hereinafter mentioned), who was confined in a mental institution. Over half the cost of maintaining said household during the taxable year was furnished by the petitioner. On about February 15, 1952, the physical location of the household was changed from one street address to another, in St. Louis.

During the year 1952, the three sisters first above mentioned each had gross income in excess of $600; but Emilie had no gross income, and was a dependent of petitioner within the meaning of section 25 (b) of the 1939 Code.

Beginning on September 14, 1946, the sister Emilie, who was unmarried, was continuously and successively confined in mental institutions, which were the Norbury Sanatorium at Jackson, Illinois, the Edgewood Retreat, the Barnard Nursing Home, and, again, the Norbury Sanatorium. She suffered from acute schizophrenia, formerly called dementia praecox. Initially, shock treatments were utilized, but did not effect recovery. No medication for curative purposes was administered; however, tranquilizing drugs were used to render her more docile. She could dress and feed herself, but was resistant to care in the absence of tranquilizing drugs. She did not engage in occupational therapy, but she had colored books and sat on the lawn. At times she was lucid, at other times confused; and she had hallucinations. During 1952 and subsequent years, her confinement in a mental institution was not absolutely mandatory, for she could have been maintained elsewhere with 24-hour nursing care. Petitioner had been continuously informed of her condition by periodic reports from the sanatoriums. In 1952 she was 72 years of age. Her doctors believed that, considering her age and the nature of her longstanding affliction, she had little, if any, chance of recovering.

On January 14, 1953, petitioner filed his income tax return for the calendar year 1952 (which was made a part of the stipulation). In this, he claimed a dependency exemption in respect of his sister Emilie; claimed a deduction for certain medical expenses, including $3,902.48 paid to Norbury Sanatorium Company for Emilie; and also claimed the status of head of a household. In support of his claim to such status, he represented in the return that he was unmarried at the close of the taxable year; that his sister Emilie, who was "in hospital," shared during his entire taxable year, his home which was

his principal residence; and that, of the entire cost of maintaining the household, he furnished $4,252, and all others (his sisters) furnished $1,560.

Subsequently, on March 5, 1953, petitioner filed an amended income tax return for 1952 (incorporated in the stipulation), in which he did not claim the status of head of a household. But, on March 12, 1953, he also filed a claim for refund (Form 843) for the year 1952 (made a part of the stipulation), in which he claimed the status of head of a household, and in which he set forth the following statement:

Under the section of the law relating to the establishment of the status as the Head of the Household, I wish to advise that I have one sister wholly dependent on me as she has no income whatever and who lived in my household together with three others of my sisters, who are not dependent on me, until it was necessary to place her in a sanatorium on account of her mental and physical condition and that the expense of maintaining her in that institution is a minimum of $75.00 weekly. I understand from the local revenue bureau that if my dependent is away only temporarily, I can qualify as head of the household, but as I am unable to advise you that her confinement in a sanatorium is or is not of a temporary nature, it was suggested I pay the tax of a single person and make a claim for a refund in anticipation of the clarification of the regulations. Having in mind that if my sister is ever able to leave the sanatorium she will again live in my home, I feel my case is an equitable one. I furnished more than one-half of the cost of maintaining the household during the taxable year, I having furnished approximately $4252.00 and my sisters $1560.00. I shall be glad to submit verification of these figures, and if any additional information is desired, please advise me.

The following additional facts are also found:

The respondent, in his notice of deficiency herein, made the following statement:

The issue raised in your claim for refund requesting that you be granted the status of head of household has been given careful consideration, and it has been determined that you do not qualify for that status because you have not established that the absence of your dependent sister from the household is temporary, and that you are maintaining such household anticipating her return.

If a petition to The Tax Court of the United States is filed against the deficiency proposed herein, the issue set forth in your claim for refund should be made a part of the petition to be considered by the Tax Court in any redetermination of your tax liability. * * *

In said notice of deficiency, respondent allowed the dependency exemption claimed on the return in respect of Emilie; and he made no adjustment in respect of the medical expenses claimed on the return, including those for Emilie.

The petitioner, in his verified petition herein, alleged error in respondent's failure to allow him the status of head of a household; and he also alleged that he "continues to maintain a household for his sister in the hope and expectation that she will recover and return to the household he is maintaining for her." Respondent, in

his answer, denied both of these allegations. Thereafter the above-mentioned stipulation of facts was executed.

## I.

The question here presented is a relatively narrow one: Whether the household which petitioner, an unmarried man, had maintained for approximately 30 years as the home for himself and at least three of his sisters, constituted also, within the meaning of section 12 (c) of the 1939 Code, the "principal" place of abode during the taxable year of another sister, Emilie, who was supported by petitioner as a dependent, who at least until 1946 had lived in the household as a member thereof, but who continuously since 1946 had been confined in sanatoriums where she was afflicted with mental illness.

Counsel for respondent agreed, at the trial, that if Emilie had not been in the institution and had been living in petitioner's home, there would be no question that petitioner would be entitled to classification as head of a household. But he contended that, when consideration is given to Emilie's age, the length of her confinement in sanatoriums, the nature of her affliction, the type of treatment she was receiving, the slight hope which the doctors held for her recovery, and petitioner's knowledge of her condition, it is unreasonable to assume that she would return to petitioner's household, and unreasonable to regard this household as her principal place of abode, as a member thereof.

Neither we ourselves nor counsel for either party has found any decided case in which the question here involved has been considered. We, therefore, seek the purpose and intent of the applicable section of the Code, and adopt that construction and application which best gives effect to such purpose and intent.

Section 12 (c) first became part of the 1939 Code, pursuant to an amendment contained in section 301 (a) of the Revenue Act of 1951, effective for taxable years beginning after October 31, 1951. The report of the Ways and Means Committee of the House of Representatives,[2] respecting the bill for said Revenue Act, states in part, as follows:

1. *Description.*

The bill provides a new surtax table applicable, for taxable years beginning after August 31, 1951 [changed later to October 31, 1951], to persons who qualify as a "head of household." Thus for a calendar-year taxpayer the provision will not become effective until 1952. The new surtax table is constructed to give heads of households approximately one-half of the benefits of income splitting.

\* \* \* \* \* \* \*

[2] H. Rept. No. 586, 82d Cong., 1st Sess., pp. 8–11, 105–107.

A taxpayer is considered as maintaining a household only if during the year he furnishes more than half the maintenance costs of such household. Moreover, the individual who makes it possible for the taxpayer to gain the benefits of the head-of-household status must actually live in the taxpayer's household unless he is temporarily absent, for example, attending school or for reasons of health. * * *

* * * * * * *

3. *Reasons for adopting the head-of-household provision.*

It is believed that taxpayers, not having spouses but nevertheless required to maintain a household for the benefit of other individuals, are in a somewhat similar position to married couples who, because they may share their income, are treated under present law substantially as if they were two single individuals each with half of the total income of the couple. The income of a head of household who must maintain a home for a child, for example, is likely to be shared with the child to the extent necessary to maintain the home, and raise and educate the child. This, it is believed, justifies the extension of some of the benefits of income splitting. The hardship appears particularly severe in the case of the individual with children to raise who, upon the death of his spouse, finds himself in the position not only of being denied the spouse's aid in raising the children, but under present law also may find his tax load heavier.

However, it was not deemed appropriate to give a head of household the full benefits of income splitting because it appears unlikely that there is as much sharing of income in these cases as between spouses. In the case of savings, for example, it appears unlikely that this income will be shared by a widow or widower with his child to the same extent as in the case of spouses. As a result only one-half of the benefits of income splitting are granted to heads of households.

* * * * * * *

DETAILED DISCUSSION OF THE TECHNICAL PROVISIONS OF THE BILL

* * * * * * *

Section 12 (c) is intended to apply only where the taxpayer and such other members of the household live together in such household during the entire taxable year (except for temporary absences due to special circumstances). The fact that a child may be at college during the college term does not prevent the home of the taxpayer from also constituting the principal place of abode of the child. However, such home will not be considered as the principal place of abode where the child establishes a separate habitation and only returns for periodic visits. Similarly, such home will not be considered as constituting the principal place of abode of a dependent of the taxpayer who is supported by the taxpayer for a substantial part of the year in lodgings other than those occupied by the taxpayer even though such person may at various periods live in the household, unless the residence of the dependent in other lodgings is not permanent and is due to necessity such as illness. * * *

Similar, though less extended, statements respecting section 12 (c) are contained in the report of the Senate Finance Committee,[3] and also in the Summary of the Conference Committee.[4]

---

[3] S. Rept. No. 781, 82d Cong., 1st Sess., pp. 8–11.

[4] Summary of the Provisions of the Revenue Act of 1951 (H. R. 4473) as agreed to by the Conferees, pp. 5–6.

Following the enactment of section 12 (c), the Treasury Department prescribed Regulations 118, which provide in part, as follows:

Sec. 39.12–4. *Surtax in case of head of household*—

\* \* \* \* \* \* \*

(c) *Household.* Section 12 (c) is applicable only where the household actually constitutes the home of the taxpayer for his taxable year and also constitutes the principal place of abode of at least one other person specified in section 12 (c) (3) (A) or provided for in section 12 (c) (3) (B) for such taxable year, without regard to the fact that the physical location of such household may have changed during such taxable year. It is not sufficient that the taxpayer maintain the household without being its occupant. The taxpayer and such other person must occupy the household for the entire taxable year of the taxpayer. They will be considered as occupying the household for such entire taxable year notwithstanding temporary absences from the household due to special circumstances. A nonpermanent failure to occupy the common abode by reason of illness, education, business, vacation, military service, or a custody agreement under which a child or stepchild is absent for less than six months in the taxable year of the taxpayer, shall be considered a temporary absence due to special circumstances. Such absences will not prevent the taxpayer from qualifying as the head of a household if (1) it is reasonable to assume that the taxpayer or such other person will return to the household, and (2) the taxpayer continues to maintain such household or a substantially equivalent household in anticipation of such return. \* \* \*

Based on the above-mentioned committee reports, which we have quoted in part, it is our opinion that the basic purpose and intent of section 12 (c) is to extend to unmarried householders, some of the benefits of the income splitting which is available to married couples—if the household, in addition to being the taxpayer's own home, is also the principal place of abode of his unmarried child, stepchild, grandchild, or any other person who qualifies as a dependent and with whom, as such, he shares his income. The Congress, by employing the adjective "principal" in referring to the abode of the person whom we shall hereinafter call the "dependent," has implied that such person may have more than one abode. And the committee reports, in conformity with such implication, have made it abundantly clear that the benefits of the statute are not to be denied, where the dependent is absent because of special circumstances, such as attendance at school or for reasons of health, that do not permanently sever his ties to the home, "as a member of such household."

The Treasury regulations, also, indicate that the statute is not to be given a narrow or restricted construction. These regulations point out that the required "household" may continue throughout the taxable year, notwithstanding that the physical location of such household may have changed during the year. They also state (even more broadly than the words of the statute itself) that either the taxpayer or the dependent will be "considered" as occupying the household for the entire taxable year, notwithstanding a "nonpermanent" failure of

either to occupy the common abode by reason of illness, education, business, vacation, military service, or a child custody agreement. No distinction is made between dependents who are infants and those who are aged. And, except in the case of a child custody agreement (mentioned in the regulations), no limitation or restriction is placed on the period during which any absence may continue to be considered as nonpermanent.

With these principles in mind, we approach the problem of what tests should be applied, in determining whether a household of which a dependent has long been a member should continue to be "considered" as his "principal place of abode"—even though he is confined in a hospital or sanatorium for reasons of health, though his period of confinement may have been long, and though there may be only slight chance for his recovery. None of the tests suggested in the committee reports and in the regulations deals specifically with illness; and in our opinion they were intended to be guides, and not to provide rules of thumb or formulas for handling all cases and situations which might arise. Rather, we think that in determining the principal place of abode, each case must be decided on its own particular facts and circumstances.

Although section 12 (c) does not employ the term "domicile," and although it is not necessary for us to determine, in the instant case, whether "domicile" and "principal place of abode" coincide, it is significant that both of these concepts usually require a determination of the place which is the principal "home," when more than one "dwelling place" is involved. Restatement, Conflict of Laws (1934 ed.), contains the following statements and comments, which appear to have a bearing on the problem:

SEC. 9. DOMICIL.

Domicil is the place with which a person has a settled connection for certain legal purposes, either because his home is there, or because that place is assigned to him by the law.

* &ast; &ast; &ast; &ast; &ast; &ast;

SEC. 13. HOME DEFINED.

A home is a dwelling place of a person, distinguished from other dwelling places of that person by the intimacy of the relation between the person and the place.

* &ast; &ast; &ast; &ast; &ast; &ast;

Illustrations:

* &ast; &ast; &ast; &ast; &ast; &ast;

i. His intention when absent to return to the place. The intention to return to a dwelling place existing whenever one is absent from that place is an important element in determining that the place is his home. A person may regard a place as his home, though he intends to be absent for long intervals; * &ast; &ast;

* &ast; &ast; &ast; &ast; &ast; &ast;

SEC. 22. &ast; &ast; &ast;

*Comment:*

* * * * * * *

*b.* The domicil in the following cases must be determined by considering whether the change of residence has been accompanied by an intention to change the home. * * *

* * * * * * *

5. A, domiciled in New York, being advised to go abroad for his health, goes to Nice, takes a house on a long lease, and lives there for several years until his death; being unable on account of his health to return, although desirous of so doing. A may be found to remain domiciled in New York.

* * * * * * *

SEC. 40. DOMICIL OF PERSON MENTALLY DEFICIENT OR OF UNSOUND MIND.

A person who is mentally deficient or of unsound mind can acquire a domicil as if he had normal mental capacity if he is able to choose a home.

*Comment:*

* * * * * * *

*f. When committed to institution.* An insane person who is committed to an asylum does not acquire a domicil in the asylum, but if he voluntarily lives in such a place, being free to leave at will, he may acquire a domicil there if he is not incapable of choosing a home * * *

None of the above statements is controlling here—because, as before stated, it is not necessary here to determine domicile, and also because the facts therein stated are not precisely the same as those involved in the instant case. But, in the absence of any cases which are decisive of the present problem, we regard them to be helpful.

*II.*

The instant case was submitted on an agreed statement of facts, together with certain joint exhibits of the parties. Although the facts so stipulated are not as detailed as would be expected in a case where the facts are contested, we think that the stipulation together with the reasonable inferences which the trial court is permitted to draw therefrom, are sufficient to disclose the true situation presented.

The stipulation reveals that petitioner maintained a household which was "a home in which he and his sisters, including Emilie Hein, had lived for approximately thirty years prior to 1952 [the taxable year involved]." Petitioner's income tax return, which was received as a joint exhibit, shows that petitioner claimed the status of head of a household, on the ground that Emilie, though in a hospital, "shared" his home. Petitioner's claim for refund, which was filed at the suggestion of respondent and which also is a joint exhibit of the parties, contains the statement that Emilie lived in petitioner's household "until it was necessary to place her in a sanatorium on account of her mental and physical condition"; that petitioner thereafter supported her as a dependent, in various mental institutions; that she had not recovered; and that, although petitioner could not

determine that her confinement " is or is not of a temporary nature," he intended that "if my sister is ever able to leave the sanatorium she will again live in my home."

We think that these facts, presented by agreement of the parties under circumstances where no question of credibility is involved, are sufficient to establish, at least prima facie, the petitioner's right to the benefits of section 12 (c). We are convinced that petitioner's household was the principal place of abode of Emilie, at the time when her confinement in the sanatoriums began; that it continued to be her principal place of abode throughout the period of her confinement due to the special circumstance of mental and physical illness; that neither Emilie nor the petitioner, who was in substance her quasi guardian, ever intended that such confinement should terminate her relationship to her preexisting home, "as a member of such household"; that no new permanent principal place of abode was established; and that petitioner intended to hold the household open for her return, whenever she could leave the sanatorium. The statute requires nothing more.

Respondent's principal contention, both at the trial and on brief, was that, because of Emilie's age and her slight chance for recovery, it was unreasonable to assume that she would return to petitioner's household. But we think that such contention is based on misapplication of the congressional intent; and that the true test is not whether the return may be prevented by an act of God, but rather whether there are indications that a new permanent habitation has been chosen. Having in mind the basic purpose of the statute, we are unwilling to conclude that it was the intention of the Congress that, where a child or other dependent is sent to a hospital under circumstances that make it likely he will die, this, in itself, is sufficient to change the principal place of abode. And we think this is true, regardless of the age of the dependent. It is our opinion, in the instant case, that neither the age of the dependent, nor the length of her confinement with illness, nor the possibility or even probability that death might intervene before she returns, is sufficient to make her absence permanent for purposes of section 12 (c).

We hold that the petitioner is entitled to the status of head of a household for the taxable year here involved.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

MURDOCK, *J.*, dissenting: The regulation provides that absences will not disqualify if (1) it is reasonable to assume that the dependent will return to the household of the taxpayer, and (2) the taxpayer con-

tinues to maintain the household or a substantially equivalent household in anticipation of the return of the dependent. This regulation seems reasonable to me. The evidence in this case indicates that it was unreasonable to assume, during the taxable year, that the dependent would ever return to any household of this petitioner. The taxpayer was no longer maintaining, during the taxable year, the household in which he and the dependent had lived at the time she left. There is no evidence to show that the household he was maintaining during the taxable year was "a substantially equivalent household" to the one which the dependent left. The only evidence on this point is the following statement in an affidavit of the petitioner attached to a claim for refund: "Having in mind that if my sister is ever able to leave the sanatorium she will again live in my home." There is no showing that the house in which he lived during the taxable year contained any special arrangements for her return such as, for example, her own room, her own furniture, her own clothes, or other possessions, which might show that the petitioner really was maintaining a home for her in anticipation of her possible return. It is useless to discuss domicile with relation to an insane person, but the fact is that the taxpayer's place of abode during the taxable year was not the domicile which the dependent left when she left to receive treatment for a mental disorder. The petitioner has not produced evidence to bring himself within the regulation or the statute entitling him to be considered the head of a household.

TURNER, KERN, OPPER, and TIETJENS, *JJ.*, agree with this dissent.

---

TURNER, *J.*, dissenting: The stipulated facts, in my opinion, require the conclusion that there is no likelihood that the dependent will ever return to petitioner's abode to live for even a short time. The doctors refused to say there was such a likelihood, and the petitioner himself frankly admits he cannot conscientiously say there is. It would thus appear that on petitioner's own presentation of his case, his contention is contrary to the regulations, in respect of which it is well settled that they have the force and effect of law, unless they are unreasonable under the statute. We may not, as it seems to me the majority seeks to do here, properly bypass the regulations, but must sustain them if they are reasonable, or strike them down if they are not.

It is my view, also, that the stipulated facts require the further conclusion that a decision was made, presumably by the petitioner himself, that not his home but a sanatorium should be the principal abode of the dependent, as it in fact had been for a period of 6 years up to and

including the year herein. It would thus follow under the statute, when read alone or in conjunction even with the committee reports, that the petitioner does not qualify for the tax treatment contended for. In other words, the facts do not show a temporary absence from petitioner's home, since this sanatorium or another will in reason be the principal abode of the dependent as long as she lives.

To hold as the majority does is in my opinion to legislate, which is specifically the function of Congress and not that of this or any other court. I accordingly note my dissent.

MURDOCK and BRUCE, *JJ*., agree with this dissent.